IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          )
                                  )
          v.                      ) Criminal No. 07-364
                                  )
KEVIN DARNELL VENSON              )

O P I N I O N

DIAMOND, D.J.

On October 2, 2007, the grand jury returned a one-count indictment against defendant Kevin Darnell Venson ("defendant") charging him with possession of a firearm by a convicted felon, in violation of 18 U.S.C. §922(g)(1). On November 14, 2008, defendant filed a motion to suppress evidence (the "Motion"), in which he raised a number of grounds for suppression (Document No. 44), as well as a motion to produce evidence which the government intends to use under Fed.R.Evid. 404(b) and 609 (Document No. 46). On December 2, 2008, the government filed its response to defendant's motions (the "Response") (Document No. 47). A suppression hearing was held on February 11, 2009.

At the conclusion of the hearing, defendant's counsel requested leave to submit post-hearing briefs after the suppression hearing transcript was filed. The government subsequently filed its supplemental response to defendant's motion to suppress (the "Supplemental Response") (Document No. 63), and defendant filed his post-suppression hearing brief ("defendant's

Brief") (Document No. 68). For the reasons set forth herein, defendant's motion to suppress evidence and his motion under Rules 404(b) and 609 will be denied.

## I.  **Factual Background**

At the suppression hearing, Parole Agent Jeffrey Long, Supervisor Deputy United States Marshal Michael Baughman and Deputy United States Marshal Jon Gallagher testified on behalf of the government.  Defendant presented the testimony of Erika Hargraves.  The court finds that the evidence presented at the hearing establishes the facts that follow.

Parole Agent Long, who is employed by the Pennsylvania Board of Probation and Parole ("Parole Board"), works on the Fugitive Apprehension and Search Team, which is assigned to the Western Pennsylvania Fugitive Task Force.  Transcript ("Tr.") of Suppression Hearing (Document No. 62), at 4.  Deputy Marshal Baughman is responsible for the investigative activity of the Fugitive Task Force, which is sponsored and led by the United States Marshals Service.  Tr. at 51.  In addition to the Marshals, the Task Force includes designated personnel from the Pennsylvania State Police, the Pennsylvania Parole Board, the Allegheny County Sheriff's Department and the City of Pittsburgh Police Department. Tr. at 51.  The purpose of the Fugitive Task Force is to locate and apprehend federal, state and local fugitives, and, in doing

2

so, the members execute warrants issued by the federal district court, as well as warrants issued by other agencies, such as the Parole Board. Tr. at 51-52. In matters involving state parole violators, one of the state parole agents on the Fugitive Task Force, such as Parole Agent Long, takes the lead in investigating the case and is present when an arrest attempt is made, along with other Task Force members who assist in executing the arrest. Tr. at 52-53.

Parole Agent Long explained the procedure for arresting an individual who has violated the conditions of his parole. If a parole agent determines that a parolee has violated a condition of parole, the parole agent notifies his supervisor and completes a Delinquency Request Form, also referred to as a 62A Form. Tr. at 5. The purpose of completing a Delinquency Request Form is to request that a warrant be issued for a parole violator. Tr. at 5, 6-7, 19. According to Long, the Parole Board does not issue paper warrants. Tr. at 19. Rather, once a supervisor approves the Delinquency Request Form, it is faxed to the Special Projects Division of the Parole Board in Harrisburg, the information is entered into the National Crime Information Center ("NCIC") database and a warrant is issued for the parolee's arrest. Tr. at 5, 9, 19.

In defendant's case, he was released on parole on February 1, 2006, in connection with Allegheny County Court of Common Pleas

3

Case No. 98-15056, which involved a conviction for carrying a firearm without a license. See defendant's Motion, Ex. 1, Order to Release on Parole. One of the conditions of defendant's parole required him to reside at 523 North Negley Avenue, Apt. 2, Pittsburgh, Pennsylvania. See defendant's Motion, Ex. 2, Conditions Governing Parole, ¶2. Another condition of defendant's parole required that he report to his parole officer, id., ¶3a, which he failed to do on April 17, 2006. Tr. at 7. On that same date, defendant's parole agent, Nicholas Sobel, went to defendant's approved residence at 523 North Negley Avenue, and was informed by his wife that defendant had moved from that residence. Tr. at 8. Parole Agent Sobel then searched the North Negley residence.[1] Tr. at 8-9.

As a result of defendant's conduct, Sobel completed a Delinquency Request Form indicating that defendant violated the conditions of his parole by failing to reside at his approved residence, by failing to maintain contact with his parole officer as directed, and by failing to comply with special conditions of parole, which is a broad condition that encompassed defendant's failure to submit to urinalysis testing and failure to comply with electronic monitoring. See Tr. at 7; defendant's Motion, Ex. 3,

---

[1] One of the conditions governing defendant's parole provided that he "expressly consent[s] to the search of [his] person, property and residence, without a warrant by agents of the Pennsylvania Board of Probation and Parole." See defendant's Motion, Ex. 2, ¶7.

4

Delinquency Request Form, a copy of which also was entered into evidence at the suppression hearing as Government Ex. 1. The Delinquency Request Form further stated that it was unknown whether defendant had possession of a weapon, but that he had a history of carrying a firearm. See defendant's Motion, Ex. 3. The Delinquency Request Form also indicated possible leads where defendant could be located as East Liberty, zip code 15206, or Braddock, zip code 15104. Id. Parole Agent Sobel's supervisor, Mark Gagbona, approved the Delinquency Request Form. Id.; Tr. at 9.

On April 18, 2006, the Parole Board issued an administrative action as to defendant that states "Declare Delinquent Effective 4/14/06." See defendant's Motion, Ex. 4. Also on April 18, 2006, a warrant for the defendant's arrest was entered into the NCIC system, and an NCIC entry receipt was generated. Tr. at 10. The NCIC entry receipt is available to any law enforcement agency that has access to the NCIC. Tr. at 10. Parole Agent Long testified that the NCIC entry receipt that pertained to defendant, which was entered into evidence at the hearing as Government Ex. 2, indicates under "DOW", meaning "date of warrant", that the warrant was entered on April 18, 2006. Tr. at 10. The entry receipt contains defendant's name, biographical and identifying information, and indicates that he was a wanted person, as opposed to a missing person. See Government Ex. 2; Tr. at 10.

5

In July 2006, Parole Agent Long became familiar with defendant's case because Parole Agent Sobel approached him about the matter. Tr. at 6. Parole Agent Long's duties include assisting parole agents in locating parolees who have warrants issued for their arrest and assisting the Fugitive Task Force in executing warrants for parole violators. Tr. at 6, 11.

According to Parole Agent Long, in July 2006, he received information from a confidential source that defendant was staying at 6939 Mount Vernon Street in Pittsburgh, Pennsylvania with a woman named Erika. Tr. at 11-12, 29; see also Defendant's Motion, Ex. 5, United States Marshals' Report of Investigation. An investigative check of 6939 Mount Vernon Street revealed that Erika Hargraves was the current occupant of the residence. Tr. at 12. Parole Agent Long also received information that defendant may be in possession of a firearm. Tr. at 33; defendant's Motion, Ex. 5.

After identifying defendant's possible location, on July 25, 2006, Deputy Marshal Baughman confirmed that the parole warrant for defendant's arrest still was active by performing a computer-based criminal history search. Tr. at 54-55. The search produced a "hit confirmation" in the NCIC database that indicated there was an outstanding warrant for defendant's arrest based on a parole violation, which had been issued on April 18, 2006. Tr. at 55. A copy of the NCIC "hit confirmation" was entered in evidence at

6

the hearing as Government Ex. 3.

On July 26, 2006, Parole Agents Long and Sobel, along with Deputy Marshals Baughman and Gallagher and other Fugitive Task Force members, went to 6939 Mt. Vernon Street and made contact with Ms. Hargraves. Tr. at 12. The Task Force members knocked on the front door and identified themselves as law enforcement officers. Tr. at 12, 35. Parole Agent Long informed Ms. Hargraves that they had a warrant for defendant and asked if he was present in the residence. Tr. at 13, 35-36. Ms. Hargraves indicated that defendant was asleep upstairs in the residence. Tr. at 13, 36, 91. The officers learned from Ms. Hargraves that her children were upstairs as well, so they asked her to call the children down. Tr. at 13, 37. Ms. Hargraves and her children then were escorted to a safe location outside the residence. Tr. at 39.

The Task Force members attempted to call defendant downstairs, but he did not surrender to their request. Tr. at 14. Because the Task Force members had reason to believe that defendant may have been in possession of a firearm, they decided to call a K9 unit to assist them. Tr. at 14. When the K9 unit arrived, an officer announced the K9 officer's presence several times and requested that defendant come downstairs. Tr. at 15, 68. When defendant failed to comply, the K9 officer was deployed and indicated by barking that defendant was in the upstairs front

AO 72
(Rev. 8/82)

bedroom. Tr. at 15, 68. The Task Force members located defendant lying on the right side of the bed and took him into custody. Tr. at 15.

The Task Force members did not immediately remove defendant from the bedroom because their procedure required that he be placed in leg shackles, which had to be retrieved from one of their vehicles. Tr. at 16. At that point, the Task Force members conducted a protective sweep of the bedroom to check for weapons, as well as other areas of the house to ensure no one else was inside. Tr. at 16, 44-45, 69. Parole Agent Long observed a firearm located on a shelf in an open bedroom closet immediately to the right of where defendant was lying on the bed. Tr. at 17, 41-42, 69. Parole Agent Long did not retrieve the firearm at that time, but he advised Deputy Marshal Baughman that a firearm was spotted. Tr. at 17. After the protective sweep of the bedroom and the remainder of the house was complete, defendant was removed from the house. Tr. at 45-46.

After learning that a firearm was located in the closet of the bedroom where defendant was arrested, Deputy Marshal Baughman went outside to seek Ms. Hargraves' consent to search the residence. Tr. at 59, 69, 71. Baughman told Ms. Hargraves that a weapon was found in the bedroom and asked if she owned a firearm. Tr. at 60, 72. She said that she did not own any firearms. Tr. at 60, 72. Baughman asked Ms. Hargraves whether

8

she knew if there were any other weapons in the home, and she said she was not aware of any. Tr. at 60, 72, 97.

When Baughman asked for Ms. Hargraves consent to search her residence, she initially was somewhat reluctant. Tr. at 59, 60, 72. Baughman explained to her that there could be other weapons in her home, which could present a danger to her children if they found them. Tr. at 60, 72-73. Baughman did not believe any other law enforcement officers were present when he sought Ms. Hargraves' consent to search. Tr. at 60, 76. However, a female neighbor of Ms. Hargraves overheard Baughman's discussion with her and commented that defendant was "bad news" and Ms. Hargraves needed to do the right thing and move on with her life. Tr. at 61, 73. Baughman did not know the neighbor's name, and he did not ask the neighbor to participate in his conversation with Ms. Hargraves or offer her advice. Tr. at 74. Baughman did not threaten Ms. Hargraves in any way when he sought her consent. Tr. at 78. After contemplating the situation, Ms. Hargraves ultimately consented to a search of her residence.[2] Tr. at 59,

---

[2]Ms. Hargraves recounted a different version of her interaction with law enforcement. Ms. Hargraves testified that an officer showed her a gun that he found and asked her if she knew there was a gun in her house, to which she responded that she did not. Tr. at 95. Ms. Hargraves also testified that there was no neighbor present when the officer spoke to her. Tr. at 98. Ms. Hargraves did not recall having a conversation with Deputy Marshal Baughman about the fact that her children could be in danger if they found any additional firearms that might be in the house. Tr. at 97, 99. According to Ms. Hargraves, no law enforcement officer asked her for consent to search. Tr. at 96. For the

9

60, 73. Approximately five minutes passed from the time Deputy Marshal Baughman approached Ms. Hargraves until she gave her consent to search. Tr. at 76.

Baughman transmitted over the radio to those inside the residence that Ms. Hargraves gave consent to search, and the Task Force members then began the search of her home. Tr. at 46, 60, 61, 80. At that point, Parole Agent Long recovered a .22 caliber handgun from the shelf inside the bedroom closet. Tr. at 46. Deputy Marshal Gallagher found a .380 caliber handgun in a pair of men's shorts located on the floor beside the bed where defendant was arrested. Tr. at 80. In addition, six baggies that contained crack cocaine were found in a small pocket of the men's shorts. Tr. at 80.

Ms. Hargraves testified that she was not dating defendant and that their relationship just involved sex. Tr. at 87, 98. According to Ms. Hargraves, she and defendant had sex on five or six occasions in June and July of 2006 until he was arrested. Tr. at 88. Ms. Hargraves testified that defendant did not live in her home, but he occasionally stayed over night when they had sex. Tr. at 88, 98. On the night before defendant's arrest, he called Ms. Hargraves and asked her to open the door so he could come into her home. Tr. at 89. Ms. Hargraves opened the door, let

reasons explained in Section II.B.3, infra, the court finds that Ms. Hargraves' testimony concerning consent to search is not entirely credible.

10

defendant in, and then she went back to bed.  Tr. at 89.

## II.  **Defendant's Motion to Suppress Evidence (Document No. 44)**

Defendant contends that the evidence seized as a result of his arrest and the subsequent search of Ms. Hargraves' residence at 6939 Mt. Vernon Street should be suppressed for the following reasons: (1) defendant's arrest was not authorized under the Fourth Amendment because the Task Force members did not have a valid arrest warrant when they entered Ms. Hargraves' home; (2) even if a valid arrest warrant existed, the Task Force members' entry into Ms. Hargraves' residence without a search warrant to execute defendant's arrest was unlawful; (3) Ms. Hargraves did not consent to a search of her residence; and (4) alternatively, Ms. Hargraves' consent to search was involuntary and it was the fruit of the prior unlawful entry.

The government responds that the evidence should not be suppressed because defendant did not have a legitimate expectation of privacy in Ms. Hargraves' residence when it was searched.  Even if defendant had a legitimate expectation of privacy, the Task Force members' entry into Ms. Hargraves' residence and arrest of defendant did not violate the Fourth Amendment because it was based on a warrant issued by the Parole Board.  Further, Ms. Hargraves consented to a search of her residence.

After considering the parties written submissions and the

11

evidence presented at the suppression hearing, the court concludes that defendant's motion to suppress must be denied. As an initial matter, defendant lacks standing to assert a Fourth Amendment violation in this case. Even if defendant did have standing, the Task Force members entered Ms. Hargraves' residence based on a warrant issued by the Parole Board, and they were not required to obtain a search warrant to enter Ms. Hargraves' residence to arrest defendant. Further, Ms. Hargraves voluntarily consented to the search of her residence following defendant's arrest.

## A. Defendant lacks standing to assert a Fourth Amendment violation

The Fourth Amendment right to be free from unreasonable searches and seizures is a personal right and a defendant must establish standing in order to assert that right. See United States v. Padilla, 508 U.S. 77, 81-82 (1993). It is the defendant's burden to establish standing to raise a Fourth Amendment challenge. See United States v. Salvucci, 448 U.S. 84, 86-95 (1980); Rakas v. Illinois, 439 U.S. 128, 130 n.1 (1978). In order to establish standing, an individual claiming Fourth Amendment protection must "demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." Minnesota v. Carter, 525 U.S. 83, 88 (1998).

The government argues that defendant did not have a legitimate expectation of privacy in Ms. Hargraves' residence when

12

it was searched. See government's Response at 3-5; Supplemental Response at 8-10. Defendant submits that he was an overnight guest at Ms. Hargraves' home, and thus he had a reasonable expectation of privacy. See defendant's Motion at 10.

In Minnesota v. Olson, 495 U.S. 91 (1990), the Supreme Court held that a houseguest has a legitimate expectation of privacy in his host's home sufficient to "enable him to be free in that place from unreasonable searches and seizures." Id. at 98. In Olson, the defendant, who held the status of a guest, was arrested in a third party's home without a warrant. The Supreme Court concluded that the defendant had standing to challenge the intrusion into the third party's home because he had an expectation of privacy as an overnight guest that society recognizes as reasonable. Id. at 96-97. In sum, Olson recognizes that a houseguest can claim protection under the Fourth Amendment.

As stated, it is defendant's burden to establish that he was an overnight guest at Ms. Hargraves' home. Ms. Hargraves testified that she and defendant were not dating, but they had sex a number of times and defendant sometimes stayed over night at her house on those occasions. On the night before defendant's arrest, he called Ms. Hargraves and asked if she could open her door and let him in, which she did. Based on the fact that defendant was present at Ms. Hargraves' residence with her assent the night before his arrest and stayed overnight there on occasion, he

13

arguably could be considered an overnight guest with standing to assert a Fourth Amendment challenge.

Although defendant could be considered an overnight guest in Ms. Hargraves' residence, the standing analysis is not complete because defendant's "Fourth Amendment rights as a guest are limited to those that he could assert with respect to his own residence." United States v. Taylor, 482 F.3d 315, 318 (5th Cir. 2007).

In Taylor, the Fifth Circuit considered the extent to which the defendant, who was on state court supervised release and wanted on a misdemeanor arrest warrant, had rights to assert Fourth Amendment protections to his girlfriend's apartment. When law enforcement located defendant at his girlfriend's apartment and no one answered the door, the officers forcibly entered, located and arrested the defendant, performed a search and found a firearm. The defendant subsequently was indicted for being a felon in possession of a firearm. He moved to suppress, claiming standing to assert a Fourth Amendment violation because he was an overnight guest in his girlfriend's apartment and arguing that the warrantless entry and search therefore were unlawful.

"Presuming that Taylor was a houseguest, he was entitled to the same Fourth Amendment protections in his girlfriend's apartment that he would have received in his own home." Taylor, 482 F.3d at 319. The Taylor court noted that those protections

14

were more limited than those afforded to the average citizen because the defendant had agreed as a condition of supervised release to a search of his person, residence or vehicle at any time. Id. at 318. Accordingly, the Fifth Circuit held that the defendant could not reasonably claim his Fourth Amendment rights were violated by the warrantless entry and search of his girlfriend's apartment while he was an overnight guest because the search would have been lawful if it had occurred in his home. Id. at 319. This was so because the officers had reasonable suspicion to believe the defendant may have been engaged in criminal conduct based on the misdemeanor arrest warrant, as well as evidence suggesting that he was in possession of a firearm and that he was in violation of the conditions of supervised release.

According to the persuasive authority of Taylor, the standing analysis in the instant case is not controlled solely by defendant's status as an overnight houseguest, but must also account for the fact that he was a parolee. In Samson v. California, 547 U.S. 843 (2006), the Supreme Court emphasized that parolees "have severely diminished expectations of privacy by virtue of their status alone." Id. at 852. It concluded that parolees "d[o] not have an expectation of privacy that society would recognize as legitimate." Id.; see also United States v. Williams, 417 F.3d 373, 376 (3d Cir. 2005) (recognizing that a parolee's expectation of privacy is less than the average

15

citizen's); <u>United States v. Randolph</u>, 210 F.Supp.2d 586 (E.D.Pa. 2002), <u>aff'd</u>, 80 Fed. Appx. 190 (3d Cir. 2003) (holding that a parolee who was a fugitive from a halfway house did not have reasonable expectation of privacy to a room in a house in which he lived during his fugitive status, and thus warrantless search of room did not violate Fourth Amendment).

Under <u>Samson</u>, defendant, as a parolee, has a diminished expectation of privacy. Defendant's expectation of privacy is further diminished by the fact that he consented to a search of his person, property and residence without a warrant as a condition of his parole. <u>See</u> defendant's Motion, Ex. 2, ¶7. Thus, a parole agent could have performed a warrantless search of defendant's approved residence if the parole agent had reasonable suspicion that he had violated a parole condition. <u>See</u> <u>Williams</u>, 417 F.3d at 376 (holding that a parolee is subject to a warrantless search of his residence based on reasonable suspicion that he had violated his terms of parole). In addition, Parole Agent Long testified that defendant could have been arrested at his approved residence without a warrant for violating a condition of his parole. Tr. at 19.

Because defendant was on parole, his rights were more limited that those of the average citizen, such as an overnight guest. As in <u>Taylor</u>, there is sufficient evidence to conclude that defendant's parole agent had reasonable suspicion that he had

16

violated various conditions of his parole. Defendant's wife informed the parole agent that defendant had moved from his approved residence, and there was information suggesting he was in possession of a firearm. As a result, defendant cannot reasonably assert that his Fourth Amendment rights were violated by the warrantless search of Ms. Hargraves' apartment because the search would have been lawful if it had occurred in his approved residence.[3]

If this court were to recognize that a parolee such as defendant has a reasonable expectation of privacy in the home of a third party, it would grant him greater rights in the third party's home than he would have in his own home. For this reason, as well as those stated above, the court finds that defendant lacks standing to assert a Fourth Amendment challenge to the Task Force members' entry into and search of Ms. Hargraves' residence.

> **B. Even assuming defendant has standing to assert a Fourth Amendment violation, the Task Force members entered Ms. Hargraves' residence to arrest defendant based on a warrant issued by the Parole Board, and a search warrant was not required to enter her residence to arrest defendant. Further, Ms. Hargraves voluntarily consented to the search of her residence following defendant's arrest.**

Although the court concludes that defendant lacks standing to assert a Fourth Amendment violation, even assuming that he could

---

[3]Even assuming defendant has standing to assert a Fourth Amendment violation, the search of Ms. Hargraves' residence was lawful because she consented to the search. See Section II.B.3, infra.

17

claim Fourth Amendment protection in this case, defendant's motion to suppress the evidence obtained as a result of the search of Ms. Hargraves' residence still must be denied. The Task Force members entered Ms. Hargraves' residence to arrest defendant based on a warrant issued by the Parole Board. As a result, the Task Force members were not required to obtain a search warrant to enter Ms. Hargraves' residence to arrest defendant. Further, Ms. Hargraves voluntarily consented to the search of her residence following defendant's arrest.

### 1. The Task Force members entered Ms. Hargraves' residence to arrest defendant based on a warrant issued by the Parole Board.

Defendant argues that the Task Force members' entry into Ms. Hargraves' residence was unlawful because they did not have a valid warrant to arrest him, and the evidence seized as a result of the warrantless entry must be suppressed. Defendant contends that the parole agent did not comply with the proper procedure to obtain authority to arrest him for his parole violations, and the parole agent's failure in that regard cannot be excused because it indicates a reckless disregard of constitutional requirements or systemic error. Defendant's arguments lack merit.

Parole Agent Long explained the procedure for arresting an individual who has violated the conditions of his parole. If a parole agent determines that a parolee has violated a condition of parole, the parole agent notifies his supervisor and completes a

18

Delinquency Request Form. The purpose of completing a Delinquency Request Form is to request that a warrant be issued for a parolee's arrest. After a supervisor approves the Delinquency Request Form, it is faxed to the Special Projects Division of the Parole Board in Harrisburg, the information is entered into the NCIC database and a warrant is issued for the parolee's arrest, although the warrant is not in paper form.

Parole Agent Long testified that Parole Agent Sobel followed these procedures in defendant's case. As a result, on April 18, 2006, the Parole Board issued an administrative action as to defendant that declared him delinquent effective April 14, 2006. Also on April 18, 2006, a warrant for defendant's arrest was entered into the NCIC system. Parole Agent Long testified that the NCIC entry receipt for defendant indicates under "DOW", which stands for "date of warrant", that the warrant was entered on April 18, 2006. The entry receipt indicates defendant was a wanted person, as opposed to a missing person.

Defendant maintains that the procedure explained by Parole Agent Long is not the proper procedure for obtaining an arrest warrant for a parole violator because it differs from the method outlined in the Pennsylvania Administrative Code. According to defendant, if Parole Agent Sobel had reason to believe that he violated a parole condition and that arrest was appropriate, Sobel should have applied for the issuance of a "warrant to commit and

19

retain" or an "order to detain for 48 hours" because these are the means by which parole agents may obtain authority to arrest under the Pennsylvania Code. See 37 Pa. Code §71.1(a), (d).

Parole Agent Long testified that a "warrant to commit and retain" is used in cases where someone other than a parole agent is going to arrest a parolee, and "an order to detain for 48 hours" is used by a parole agent to make an arrest after work hours when he cannot obtain his supervisor's approval. Tr. at 22-23. He further testified that the procedure he described is the procedure that is used by the Parole Board. Tr. at 22.

Based on Parole Agent Long's testimony, the court concludes that a valid warrant for defendant's arrest was issued by the Parole Board.[4] The warrant is confirmed by the NCIC entry receipt, which indicates that it was entered on April 18, 2006. See Government Ex. 2.

Moreover, prior to arresting defendant at Ms. Hargraves' apartment, Deputy Marshal Baughman confirmed that the warrant for defendant's arrest still was active by performing a computer-based criminal history search. That search produced a "hit

---

[4]Although the court concludes that a valid warrant for defendant's arrest was issued by the Parole Board, the court notes that Pennsylvania parole officers have been granted broad statutory powers to arrest without a warrant. Parole officers are "given police power and authority throughout the Commonwealth to arrest without warrant, writ, rule or process any parolee or probationer under the supervision of the board for failing to report as required by the terms of his probation or parole, or for any other violation thereof." 61 P.S. §331.27

20

confirmation" that appeared in the NCIC database indicating there was an outstanding warrant for defendant's arrest based on a parole violation. See Government Ex. 3. As a result, it was reasonable for the Task Force members to rely upon the NCIC information confirming that there was an outstanding warrant for defendant's arrest. See Capone v. Marinelli, 868 F.2d 102, 105 (3d Cir. 1989) (finding it was reasonable for officer to rely upon NCIC bulletin that stated a warrant existed for the defendant's arrest); United States v. Munoz, 150 F.3d 401, 411-12 (5th Cir. 1998) (concluding that officers' knowledge, through NCIC, of outstanding warrant, along with a reasonable belief that the defendant was in the apartment, sanctioned going into the apartment to arrest him); United States v. Roper, 702 F.2d 984, 989 (11th Cir. 1983) (where officer had radioed NCIC and learned of warrant for suspect's arrest for probation violation, officer had probable cause to arrest suspect); United States v. McDonald, 606 F.2d 552, 553-54 (5th Cir. 1979) ("the cases uniformly recognize that NCIC printouts are reliable enough to form the basis for the reasonable belief which is needed to establish probable cause for arrest").

The Task Force members' reliance upon the warrant issued by the Parole Board to arrest defendant also was reasonable under Herring v. United States, 129 S.Ct. 695 (2009). In Herring, officers in one county arrested Herring based on a warrant listed

21

in a neighboring county's computer database. Herring was searched incident to arrest and the officers uncovered drugs and a gun. It subsequently was discovered that the warrant had been recalled months earlier, although that information never was entered into the computer database. Herring was indicted on federal gun and drug possession charges and moved to suppress the evidence on the basis that his arrest had been illegal. Herring's suppression motion was denied by the district court and that ruling was affirmed by the Eleventh Circuit.

The Supreme Court held that the exclusionary rule does not apply in a case such as Herring's where police mistakes that lead to an unlawful search are the result of isolated negligence, rather than reckless disregard of constitutional requirements or systemic error. However, exclusion would be justified "[i]f the police have been shown to be reckless in maintaining a warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests." Herring, 129 S.Ct. at 703. Further, "[i]n a case where systemic errors were demonstrated, it might be reckless for officers to rely on an unreliable warrant system." Id. at 704.

According to defendant, Parole Agent Long's testimony that the procedure used by Parole Agent Sobel to obtain an arrest warrant for defendant, which differed from the method outlined in the Pennsylvania Administrative Code, was negligent, reckless and

22

possibly deliberate. Defendant also suggests that Parole Agent Long's testimony that the procedure used by Sobel was the Parole Board's generally accepted procedure for obtaining authorization to arrest indicates systemic error or negligence.

There is no evidence that Parole Agent Sobel negligently, recklessly or deliberately violated any Parole Board procedures in obtaining an arrest warrant for defendant. Parole Agent Sobel did not falsify information on the Delinquency Request Form that he submitted to his supervisor for approval. Rather, he set forth the fact that defendant failed to reside at his approved residence, among other parole violations. Parole Agent Sobel's supervisor approved the Delinquency Request Form, and, on April 18, 2006, the Parole Board issued an administrative action as to defendant that declared him delinquent effective April 14, 2006. Also on April 18, 2006, a warrant for the defendant's arrest was entered into the NCIC system, and an NCIC entry receipt was generated. The procedure that Parole Agent Sobel followed is consistent with Parole Agent Long's description of the procedure a parole agent is required to follow when he seeks to obtain an arrest warrant for a parole violator.

Defendant complains, however, that Parole Agent Long's description of the procedure to obtain a warrant indicates systemic error within the Parole Board because it differs from the method outlined in the Pennsylvania Administrative Code for

23

obtaining a "warrant to commit and retain" or "an order to detain for 48 hours." As already stated, Parole Agent Long testified that the procedure he described is that which is used by the Parole Board in cases such as this, and a "warrant to commit and retain" and "an order to detain for 48 hours" are used in other circumstances. Defendant has not otherwise demonstrated that the Parole Board's procedures have resulted in the improper issuance of warrants for parole violators or have led to false arrests. Thus, this court cannot conclude that there is systemic error within the Parole Board.

For the foregoing reasons, the court finds that the Task Force members entered Ms. Hargraves' residence to arrest defendant based on a warrant issued by the Parole Board. The outstanding parole warrant was confirmed by a search of the NCIC database on the day before defendant's arrest, and the Task Force members reasonably relied on that information in effecting defendant's arrest.

### 2. The Task Forces members were not required to obtain a search warrant to enter Ms. Hargraves' residence to arrest defendant.

Defendant next argues that even if a valid arrest warrant existed, the Task Force members were not authorized to enter Ms. Hargraves' residence, where he was an overnight guest who enjoyed a legitimate expectation of privacy, without a search warrant. According to defendant, the Task Force members were not permitted

24

to execute the arrest warrant without a search warrant for Ms. Hargraves' home unless exigent circumstances were present, and none were present in this case.

The Supreme Court has held that an arrest warrant does not carry with it the authority to enter the home of a third person to seize a suspect, and that to enter a third person's home the police need to get a search warrant. Steagald v. United States, 451 U.S. 204, 211-14 (1981). However, Steagald only protects "the interests of the third-party owner of the residence, not the suspect himself." United States v. Agnew, 407 F.3d 193, 196 (3d Cir. 2005); see Steagald, 451 U.S. at 212 (stating the issue to be "whether an arrest warrant - as opposed to a search warrant - is adequate to protect the Fourth Amendment interests of persons not named in the warrant, when their homes are searched without their consent and in the absence of exigent circumstances"). As stated in Agnew:

> A person has no greater right of privacy in another's home than in his own. If an arrest warrant and reason to believe the person named in the warrant is present are sufficient to protect that person's fourth amendment privacy rights in his own home, they necessarily suffice to protect his privacy rights in the home of another.

> The right of a third party not named in the arrest warrant to the privacy of his home may not be invaded without a search warrant. But this right is personal to the home owner and cannot be asserted vicariously by the person named in the arrest warrant.

Agnew, 407 F.3d at 197, quoting, United States v. Underwood, 717 F.2d 482, 484 (9th Cir. 1983).

25

As this authority makes clear, defendant cannot vicariously assert Ms. Hargraves' privacy interest in her residence. Thus, the Task Force members were not required to obtain a search warrant to enter Ms. Hargraves' residence to arrest defendant.

Having determined that the Task Force members were not required to obtain a search warrant, it was lawful for them to enter Ms. Hargraves' residence to arrest defendant based on the warrant issued by the Parole Board. This is so because the Task Force members had both probable cause and reason to believe that defendant was residing at and present in Ms. Hargraves' home when he was arrested there on July 26, 2006. "[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton v. New York, 445 U.S. 573, 603 (1980). To determine whether the police have reason to believe a suspect is residing and present in a residence,[5] courts must apply a "common sense approach" and

_____

[5]In <u>United States v. Porter</u>, 2008 WL 2333074 (3d Cir. June 9, 2008), the Third Circuit discussed whether the applicable standard is "probable cause" or "reason to believe" that a suspect is residing in a particular home. The Third Circuit explained:

> [This] Court in <u>Agnew</u> cited <u>Payton</u> as requiring a showing of probable cause before police may enter a dwelling in which a suspect is believed to be located. <u>Agnew</u>, 407 F.3d at 196. However, the express language of the Supreme Court in <u>Payton</u> was that there need only be "reason to believe" the suspect is within. <u>Payton</u>, 445 U.S. at 603, 100 S.Ct. 1371. Obviously, this Court cannot change what the Supreme Court said and the Court in <u>Agnew</u> gave no explanation for citing <u>Payton</u> as

26

consider "the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality." United States v. Veal, 453 F.3d 164, 167-68 (3d Cir. 2006), quoting, United States v. Magluta, 44 F.3d 1530, 1535, 1536 (11th Cir. 1995).

The following facts provided the Task Force members with both probable cause to believe and reason to believe that defendant was residing at Ms. Hargraves' residence and was present in the residence at the time of his arrest: (1) defendant's wife told Parole Agent Sobel on April 17, 2006, that he had moved out of his approved residence; (2) Parole Agent Long received information from a confidential source that defendant was staying at 6939 Mt. Vernon Street, Pittsburgh, Pennsylvania with a woman named Erika; (3) a records check revealed that Erika Hargraves was the current occupant of 6939 Mt. Vernon Street; (4) on July 25, 2006, Deputy Marshal Baughman performed a criminal history search that produced a hit confirmation in the NCIC database verifying that the arrest warrant for defendant still was active; (5) on July 26, 2006,

---

requiring probable cause. We believe the reference to Payton as requiring a showing of probable cause was an error. This Court in United States v. Veal, 453 F.3d 164, 167 n.3 (2006), recognized this potential error but, having found that the probable cause standard was met in that case, declined to further address the issue. Porter, 2008 WL 2333074 *2, n.3. In Porter, the Third Circuit did not comment any further on this issue because it concluded that when the police entered the apartment in question in that case, they had both reason to believe and probable cause to believe that the suspect was within that apartment.

AO 72
(Rev 8/82)

Parole Agents Long and Sobel, along with the other Task Force members, went to Ms. Hargraves' residence and made contact with her; and (6) when Parole Agent Long asked Ms. Hargraves if defendant was present in the residence, she responded that he was asleep upstairs. See Porter, 2008 WL 2333074, *3 (where occupant/owner of apartment gestured to the back of the apartment and fully opened the door, officers had both probable cause and reason to believe that the suspect currently was within the apartment, justifying their entry to execute arrest warrant).

In sum, even if defendant has standing as an overnight guest at Ms. Hargraves' residence, he cannot vicariously assert Ms. Hargraves' privacy interest in her residence and claim that the Task Force members needed a search warrant to enter and execute his arrest. An arrest warrant for defendant had been issued by the Parole Board, and the Task Force members had both probable cause and reason to believe defendant was present in Ms. Hargraves' residence on July 26, 2006. Accordingly, defendant's Fourth Amendment rights were protected and the Task Force members were permitted to enter Ms. Hargraves' home to arrest him.

### 3. Ms. Hargraves voluntarily consented to a search of her residence after defendant was arrested.

It is well-settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent.

28

Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Defendant contends that Ms. Hargraves did not consent to the search of her residence that was performed after he was arrested. Even if Ms. Hargraves did consent, defendant argues that her consent was involuntary and was the fruit of the prior unlawful entry.

Parole Agent Long, Deputy Marshal Baughman and Ms. Hargraves all testified regarding whether Ms. Hargraves consented to a search of her residence. After Parole Agent Long observed a firearm in the open closet of the bedroom where defendant was arrested, Deputy Marshal Baughman went outside to seek Ms. Hargraves' consent to search the residence. According to Baughman, he told Ms. Hargraves that a weapon had been found in the bedroom, he asked her if she owned any firearms, and she said that she did not. Baughman testified that Ms. Hargraves said she was not aware of any other weapons in the home.

Baughman further testified that Ms. Hargraves initially was reluctant when he asked for her consent to search. Baughman explained to Ms. Hargraves that there could be other weapons in her home, which could present a danger to her children if they found them. Baughman testified that a female neighbor of Ms. Hargraves overheard their conversation and made comments encouraging Ms. Hargraves to do the right thing. Baughman did not know the neighbor's name, and he did not ask the neighbor to participate in his conversation with Ms. Hargraves. Baughman did

29

not threaten Ms. Hargraves in any way when he sought her consent. Baughman testified that after contemplating the situation, Ms. Hargraves ultimately consented to a search of her residence. The entire conversation between Deputy Marshal Baughman and Ms. Hargraves lasted approximately five minutes.

Baughman testified that he transmitted over the radio to the Task Force members inside the house that Ms. Hargraves gave consent to search. Parole Agent Long and Deputy Marshal Gallagher testified that the search of Ms. Hargraves' residence began after Baughman obtained her consent. Parole Agent Long testified that he then recovered the .22 caliber handgun from the shelf inside the bedroom closet. Deputy Marshal Gallagher testified that he found a .380 caliber handgun in a pair of men's shorts located on the floor beside the bed where defendant was arrested.

Ms. Hargraves' testimony on the issue of consent differs from Deputy Marshal Baughman's account. According to Ms. Hargraves, an officer showed her a gun that he found and asked if she knew that it was in her house, to which she responded that she did not. Ms. Hargraves testified that no neighbor was present when the officer spoke to her. In addition, Ms. Hargraves did not recall having a conversation with Deputy Marshal Baughman about the potential danger to her children if they found any other firearms that might be in the house. Finally, Ms. Hargraves testified that no law enforcement officer asked for her permission to search her

30

residence.

The court, as finder of fact, is free to accept or reject any part or all of a witness's testimony. United States v. Conley, 859 F.Supp. 830, 840 (W.D.Pa. 1994). Credibility determinations are to be made in consideration of numerous factors, including the witness's demeanor and manner while on the stand, the witness's ability to accurately recollect the matters at hand, the manner in which the witness may be affected by the outcome, the extent to which the witness's testimony is either supported or contradicted by other evidence and testimony in the case, and, ultimately, the extent to which it withstands a common sense test of reason and logic.

With these concepts in mind, the court credits the testimony of the Task Force members and finds Ms. Hargraves' testimony on the issue of consent to search to be less than credible. Although Ms. Hargraves claims that no officer asked for her permission to search her residence, both Parole Agent Long and Deputy Marshal Baughman testified that Baughman sought Ms. Hargraves' consent to search after Long observed a firearm in the closet of the bedroom where defendant was arrested. Baughman candidly admitted that Ms. Hargraves initially was reluctant to give consent. However, after he explained the potential danger to Ms. Hargraves' children if any other weapons were in the house, and after she contemplated the situation, she ultimately gave consent to search. Both Parole

31

Agent Long and Deputy Marshal Gallagher testified that the search of Ms. Hargraves' residence began after Baughman obtained her consent.

The court does not credit Ms. Hargraves' testimony that one of the officers showed her a gun that he found. According to the testimony of Parole Agent Long and Deputy Marshal Baughman, Baughman sought Ms. Hargraves' consent after Parole Agent Long observed a firearm in the open closet of the bedroom where defendant was arrested. Deputy Marshal Baughman spoke to Ms. Hargraves outside. After Ms. Hargraves consented, Baughman transmitted over his radio to the Task Force members inside that she had given consent to search. Parole Agent Long testified without hesitation that he recovered the .22 caliber handgun from the bedroom closet _after_ Deputy Marshal Baughman obtained Ms. Hargraves' consent to search.[6] In addition, Deputy Marshal Gallagher testified that he recovered the .380 caliber handgun in a pair of men's shorts in the bedroom _after_ Baughman obtained Ms. Hargraves' consent. In sum, the testimony of Baughman, Long and Gallagher is all consistent, and contradicts Ms. Hargraves' assertion that one of the officers showed her a gun.

The court further finds that Deputy Marshal Baughman clearly

---

[6]Deputy Marshal Gallagher did not recall whether Parole Agent Long handled the .22 caliber handgun before Deputy Marshal Baughman obtained Ms. Hargraves' consent. Tr. at 84. However, Gallagher was sure that the search of Ms. Hargraves' residence began after she consented to the search. Tr. at 80.

AO 72
(Rev 8/82)

recalled the details of his conversation with Ms. Hargraves when he sought her consent. Baughman exhibited no hesitation when he explained that Ms. Hargraves was unaware a firearm was in her house, that he warned her about the potential danger to her children if any other firearms still were in the house, and that she ultimately consented after contemplating the situation. Deputy Marshal Baughman's testimony that he obtained Ms. Hargraves' consent to search is corroborated by the testimony of both Parole Agent Long and Deputy Marshal Gallagher. The court finds their testimony to be credible and concludes that Ms. Hargraves consented to the search of her residence.

Having determined that Ms. Hargraves gave consent to search, we next must consider whether her consent was voluntary. Consent to a search is valid if it is voluntary, meaning that consent must not be coerced, by explicit or implicit means, or by implied threat or covert force. Schneckloth, 412 U.S. at 228, 248. Whether consent is voluntary is a fact-based inquiry which must consider the totality of the circumstances. Id. at 227. Factors to consider include the characteristics of the person giving consent, such as her age, education, level of intelligence and experience and the conditions under which the consent was given. Id. at 226, 248-49. Whether the person knows of her right to refuse consent also is a factor to be taken into account, although the prosecution is not required to demonstrate such knowledge as

33

a prerequisite to establishing a voluntary consent.  Id. at 234,
249.

Considering the totality of the circumstances here, the court
concludes that Ms. Hargraves' consent to search was voluntary.
When Ms. Hargraves testified at the suppression hearing, the court
observed that she was at least of average intelligence and had no
difficulties understanding the questions that were posed to her or
responding to those questions.  At the time Ms. Hargraves gave
consent, she was an adult in her mid to late twenties.  Although
there is no indication that Ms. Hargraves herself had any prior
experience with the criminal justice system because of charges
against her, it was established at the hearing that she provided
consent on another occasion when the police executed an arrest
warrant for her father at her residence.  Tr. at 62-63, 77.  As a
result, Ms. Hargraves was familiar with the concept of the police
requesting consent to search a residence.

Although the circumstances surrounding the arrest of
defendant undoubtedly were alarming for Ms. Hargraves, she and her
children were escorted to a safe location outside of her
residence.    Deputy Marshal Baughman spoke to her outside,
indicated that a firearm had been observed in the bedroom where
defendant was arrested and explained that if other undiscovered
firearms were in her house her children could be in danger.  After
contemplating the situation, Ms. Hargraves consented to a search

34

of her residence. The conversation between Baughman and Ms. Hargraves lasted approximately five minutes before she gave her consent. There is no evidence that Deputy Marshal Baughman coerced or threatened Ms. Hargraves in order to obtain her consent. Under the totality of the circumstances, the court finds that Ms. Hargraves' consent to search her residence was voluntary.[7]

## III. Defendant's Motion to Produce Evidence which the Government Intends to Use Under Fed.R.Evid. 404(b) and 609 (Document No. 46)

Defendant seeks an order compelling the government to provide him with a statement of the nature, dates and places of occurrences of any criminal offenses or acts of misconduct other than those set forth in the indictment which the government will attempt to prove at trial pursuant to Fed.R.Evid. 404(b) and/or evidence of any prior convictions pursuant to Rule 609. Defendant also requests that the court hold a pretrial hearing to determine the admissibility of any evidence the government intends to offer

---

[7]The court need not address defendant's argument that Ms. Hargraves' consent was the fruit of the prior unlawful entry. As stated in Section II.B.1, supra, the court finds that the Task Force members lawfully entered Ms. Hargraves' residence to arrest defendant based on a warrant issued by the Parole Board.

Likewise, the court need not address defendant's argument that the search of Ms. Hargraves' residence after defendant was arrested and removed therefrom was not a lawful search incident to arrest because Ms. Hargraves voluntarily consented to the search of her residence. See Section II.B.3.

AO 72
(Rev. 8/82)

under Rule 404(b).

According to the commentary to Rule 404(b), other than requiring pretrial notice, no specific time limits are stated in recognition that what constitutes reasonable notice will depend on the circumstances of each case. Courts that have considered what constitutes "reasonable notice" have concluded that notice of intent to use Rule 404(b) evidence seven to ten days prior to trial is sufficient. See United States v. Evangelista, 813 F.Supp. 294, 302 (D.N.J. 1993) (ten days); United States v. Alex, 791 F.Supp. 723, 728-29 (N.D.Ill. 1992) (seven days); United States v. Williams, 792 F.Supp. 1120, 1133 (S.D.Ind. 1992) (ten days).

Here, the government has provided defendant with the required notice under Rule 404(b) by listing five categories of potential evidence that it may rely upon at trial. See government's Response at 13. Accordingly, defendant's request for notice under Rule 404(b) will be denied as moot. To the extent the government intends to use any other evidence that falls under Rule 404(b), the government shall provide the required notice at least ten days prior to trial consistent with the case law interpreting the rule.

Defendant's request for a pretrial hearing on the admissibility of Rule 404(b) evidence will be denied. It is preferable to resolve Rule 404(b) objections in conjunction with the factual context of the case. See United States v. Giampa, 904

36

F.Supp. 235, 284 (D.N.J. 1995) ("Generally, objections as to the admissibility of prior bad acts under Rule 404(b) are properly asserted during trial, not at the pretrial stage.").

As for defendant's request under Rule 609, the government has identified the prior convictions it intends to rely upon to impeach defendant if he testifies at trial. Specifically, the government will seek to impeach defendant with his prior convictions for robbery, possession with intent to distribute a controlled substance and carrying a firearm without a license, as well as his possession of a firearm with an obliterated serial number. See government's Response at 13-14. Defendant's request for disclosure of evidence under Rule 609 therefore will be denied as moot.

## IV. Conclusion

For the foregoing reasons, defendant's motion to suppress evidence and his motion for the production of evidence under Fed.R.Evid. 404(b) and 609 will be denied.

An appropriate order will follow.

Gustave Diamond
United States District Judge

Date: June 3, 2009

AO 72
(Rev. 8/82)

cc: Constance M. Bowden
Assistant U.S. Attorney

Elisa A. Long
Assistant Federal Public Defender

38

AO 72
(Rev. 8/82)